IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal Action |
| v. | : | No. 07-423 |
| | : | |
| ANTHONY VAZQUEZ, | : | |

**MEMORANDUM AND ORDER**

**Juan R. Sánchez, J.**                                                                                        **March 20, 2008**

      Anthony Vazquez asks this Court to suppress a handgun police officers found in his waistband when they tackled him as he fled from a drug arrest. The Government argues the officers discovered the handgun during a valid investigatory stop and safety search. Because I find the police officers had reasonable suspicion to stop Vazquez, I will deny Vazquez's motion to suppress the evidence against him.[1]

---

[1] Vazquez presented with three additional motions, all of which I deny. First, Vazquez moved to strike his alleged alias, "Eziequ Vasquez," from the indictment. I will deny this motion because the alias is relevant, material and is part of the history of the event. On a defendant's motion, a court may strike surplusage from an indictment. Fed. R. Crim. P. 7(d). "The purpose of the rule is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in the indictment." *United States v. Ali*, 2005 WL 1993519, *slip op.* at 1 (E.D. Pa. Aug. 16, 2005); *see also U.S. v. Clark*, 184 F.3d 858, 869 (D.C. Cir. 1999). When a defendant uses a different name during police interviews after arrest, the alias is "part of the history of the case and [is] clearly relevant to show that defendant was trying to conceal his identity, which suggests that defendant was conscious of his guilt of the crime." *United States v. Brown*, 2005 WL 1532538, *slip op.* at 17 (E.D. Pa. June 28, 2005) (citing *United States v. Glass*, 128 F.3d 1398, 1408 (10th Cir. 1997)). Finally, when a defendant's alias does not "in itself connote criminality, as do nicknames such as Frankie the Beast, The Snake, or Fast Eddie," there is no risk the alias might unfairly prejudice him. *Id.*

      Here, Vazquez told police officers at the time of his arrest his name was "Eziequ Vasquez," and, at the police station, Vazquez again provided the same alias when the police officers asked for background information. Vazquez made his alias part of the case history and it is relevant to prove his consciousness of guilt. The alias itself is not inflammatory and does not connote criminality. Because Vazquez's alias is part of the case history, relevant and not prejudicial, I will deny Vazquez's motion to strike the alias from the indictment.

1

**FINDINGS OF FACT**

I make the following findings of fact:

1.     On May 2, 2007, Officer Melvin Floyd and his partner, Officer Brian Kensey, of the Philadelphia Police Department's Narcotics Strike Force Unit, along with 10 to 15 back-up officers, set up surveillance for drug activity in the area of Reese and Indiana Streets in Philadelphia.

2.     In Officer Floyd's 10 years with the Philadelphia Police Department and six years in the Narcotics Strike Force, the vicinity of Reese and Indiana Streets has been known as a high crime area because of narcotics trafficking.

3.     During surveillance, Officer Floyd observed two men exchange small vials for money with various individuals. According to Officer Floyd, these transactions were consistent with narcotics transactions he has observed in the past.

4.     During the surveillance, Officer Floyd witnessed five separate transactions in which individuals approached the two men, engaged in brief conversation with them and handed money to them. Then, one of the men would walk to an open lot on the corner of Reese and Indiana Streets, pick up a bag, remove small objects from the bag and hand the small objects to the individual who had exchanged the money.

5.     Officer Floyd radioed a description of each customer to the back-up officers, located in a two to three block radius of the intersection.

---

Second, Vazquez moved to dismiss the indictment for lack of federal subject matter jurisdiction on the ground Congress lacked authority to promulgate the felon in possession statute, 18 U.S.C. § 922(g), pursuant to the Commerce Clause. I will deny this motion because the Third Circuit expressly rejected it in *United States v. Singletary*, 268 F.3d 196, 205 (3d Cir. 2001).

Finally, Vazquez's motion to compel the Government to provide reasonable written notice of intent to introduce Rule 404(b) evidence at trial is moot because the Government has filed a Motion in Limine pursuant to Rule 404(b) in a timely manner before trial.

6. Specifically, Officer Floyd described each buyer in terms of race, gender, clothing, color and make of the vehicle, if applicable, and the direction the buyer was headed either on foot or by vehicle.

7. The closest officers would stop each buyer.

8. The back-up officers always notified Officer Floyd whether they succeeded in stopping the buyers and whether they recovered any narcotics.

9. That evening, the back-up officers successfully stopped all five observed buyers and recovered narcotics on each of them.

10. At approximately 10:45 p.m., Officer Floyd observed Vazquez approach the dealers on the corner of Reese and Indiana Streets. Vazquez engaged in a brief conversation with the dealers before handing money to them.

11. Consistent with the five narcotics transactions Officer Floyd previously observed during the surveillance, one of the dealers walked to the empty lot, picked up a bag from inside of the wall, took out small objects from the bag and handed those objects to Vazquez.

12. Vazquez then left the area in a grey vehicle.

13. Officer Floyd radioed a description of Vazquez and the grey vehicle to the back-up officers. Specifically, Officer Floyd told the back-up officers Vazquez was wearing a white t-shirt, blue jeans, and entered the back seat of a grey vehicle heading west on Indiana Street.

14. Officer Michael Harrison, a member of the Narcotics Strike Force for 10 years, worked as a back-up officer on the evening of May 2, 2007.

15. At approximately 10:50 p.m. Officer Harrison received a radio broadcast from Officer Floyd that a male wearing a white t-shirt and blue jeans had just purchased narcotics and was traveling in

a grey vehicle westbound on Indiana Street.

16. Officer Harrison, located two blocks from the surveillance, stopped the grey vehicle at Ninth and Indiana Streets. He saw Vazquez sitting in the backseat, called him out of the car and told him to put his hands on the car.

17. As soon as Officer Harrison touched Vazquez's shoulders to attempt a safety pat down search, Vazquez took off running east on Indiana Street and tossed an object on the ground.

18. Officer Harrison and his partner, Officer Michael Jones, chased Vazquez down the street.

19. Officers Floyd and Kensey then came onto the scene to assist. All four officers attempted to stop Vazquez, however, Vazquez did not comply with verbal and physical commands to put his hands behind his back.

20. Once apprehended on the 800 block of Indiana Street, the four officers struggled with Vazquez for approximately two to three minutes as he swung and flailed his arms.

21. As the officers took Vazquez to the ground, Officer Harrison heard Officer Kensey shout "gun" when he spotted a handgun in Vazquez's waistband.

22. The officers turned Vazquez over and recovered the handgun.

23. After the officers secured Vazquez, Officer Harrison went over to where Vazquez threw the object and recovered a clear jar with a green cap, later determined to contain PCP.

24. Vazquez told Officer Harrison his name was "Eziequ Vasquez" when Officer Harrison asked for background information. Officer Harrison also wrote this name on the property receipt forms for the handgun and the narcotics.

**DISCUSSION**

Vazquez challenges evidence of the handgun the officers recovered in his waistband. He

argues the officers lacked reasonable suspicion to stop the grey vehicle in which he was traveling. A police officer must have a reasonable, articulable suspicion criminal activity is afoot prior to an investigatory stop. *United States v. Goodrich*, 450 F.3d 552, 559 (3d Cir. 2006) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)); *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (requiring police officers have reasonable suspicion to conduct traffic stops). In evaluating the police officer's decision to stop individuals suspected of engaging in criminal activity, the Court must consider the "totality of the circumstances," specifically the trained and experienced officer's observation and articulation of objective facts. *Id.* at 560-51. When an investigatory stop is based upon information received in a police radio bulletin, "[a] finding of reasonable suspicion to justify [a] stop require[s] the presentation of evidence by the government that the officer who issued the radio bulletin had reasonable suspicion, not simply that it was reasonable for the arresting officer to have relied on the bulletin." *United States v. Coward*, 296 F.3d 176, 180 (3d Cir. 2002) (citing *United States v. Hensley*, 469 U.S. 221 (1985)). Further, during an investigatory stop, law enforcement "may conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault [the officer]." *Terry*, 392 U.S. at 21.

I find Officer Floyd, who issued the radio bulletin, had more than reasonable suspicion to stop Vazquez. Officer Floyd, an experienced officer with the Narcotics Strike Force, witnessed Vazquez approach two drug dealers in a high crime area known for its narcotics trafficking, hand the dealers money, and receive a small object in return. At the time Vazquez engaged in this transaction, Officer Floyd had already observed five other individuals engage in similar transactions. When he was observing Vazquez, Officer Floyd knew the back-up officers successfully stopped all five buyers he described via police radio and found narcotics on all of them. After observing

Vazquez, Officer Floyd informed the back-up officers via police radio he witnessed Vazquez engage in a narcotics transaction and provided them with a detailed description of Vazquez's clothing, the color of the vehicle he entered, and the direction it headed. Officer Floyd's articulated description of Vazquez, the vehicle, and the transaction constitute sufficient objective facts to provide reasonable suspicion to stop Vazquez. Because I find Officer Floyd possessed a reasonable, articulable suspicion Vazquez engaged in criminal activity when he issued the radio bulletin, the investigatory stop was reasonable under *Terry*.

**CONCLUSIONS OF LAW**

1. The initial traffic stop on May 2, 2007 did not violate the Fourth Amendment's prohibition on unreasonable searches and seizures because Officer Floyd articulated a reason to believe Vazquez purchased narcotics from two drug dealers. *Coward*, 296 F.3d at 180.

2. Because Officer Floyd possessed a reasonable suspicion justifying a stop, Officer Harrison could rely on Officer Floyd's radio bulletin describing Vazquez to support the traffic stop. *Hensley*, 469 U.S. at 232-33.

3. Because the traffic stop was legal, Officer Harrison was permitted to conduct a safety pat down of Vazquez. *Terry*, 392 U.S. at 21.

4. None of the evidence against Vazquez was seized in a manner offensive to the Fourth Amendment.

5. Therefore, I enter the following:

**ORDER**

And now, this 20th day of March, 2008, Defendant's Motion to Suppress (Document 18) is DENIED. Defendant's Motion to Dismiss the Indictment for Lack of Jurisdiction (Document 17) is DENIED. Defendant's Motion to Compel Notice (Document 16) is DENIED as MOOT and Defendant's Motion to Strike Alias from the Indictment (Document 15) is DENIED.

BY THE COURT:

\s\ Juan R. Sánchez
Juan R. Sánchez                               J.